# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
### INDIANAPOLIS DIVISION

AMY  MARTINEZ,               )
                              )
               Plaintiffs,       )
                              )
               v.             )       Case No. 1:12-cv-00567-TWP-DKL
                              )
INDIANA UNIVERSITY HEALTH, INC.,   )
and HEALTHNET, INC.,              )
                              )
               Defendants.      )

## ENTRY ON MOTION FOR SUMMARY JUDGMENT

This matter is before the Court on a Motion for Summary Judgment filed by Defendants Indiana University Health, Inc. ("IU Health") and Healthnet, Inc. ("Healthnet") (collectively, "Defendants") (Dkt. 36).  Plaintiff Amy Martinez[1] ("Ms. Martinez") brought claims against IU Health alleging violations of the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12101-12113, as amended by the ADA Amendments Act of 2008, Pub. L. No. 110-325, § 2(b)(1) ("ADA") and the Civil Rights Act of 1964 ("Title VII") for retaliation.  For the reasons set forth below, IU Health's Motion is **GRANTED in part** and **DENIED in part**.

## I.   BACKGROUND

Ms. Martinez began working at Healthnet on August 23, 2010 as an Electronic Medical Records Analyst ("EMR Analyst").  Healthnet is a division of IU Health that operates a series of clinics serving communities that have little access to healthcare.  As an EMR Analyst, Ms. Martinez's primary role was to manage software that transferred information for lab results between IU Health and Healthnet.  At the time of her employment, Healthnet was undergoing a

---

[1] Ms. Martinez's name was Amy Gregory at the time she was employed with Healthnet.  The Court will refer to her by her current name.

rapid upgrade to its software and was attempting to move its medical records system online into a central clearinghouse system.  Ms. Martinez worked at a variety of different Healthnet clinics, as well as the company's central location, depending on whether there was a software project taking place at a particular clinic.

When she was hired, Ms. Martinez worked under the supervision of Mendy Rosa ("Ms. Rosa").  Because Ms. Martinez was a single parent and had an hour commute to work each day, Ms. Rosa permitted Ms. Martinez to work a modified eight hour schedule between 8:15 a.m. and 4:45 p.m. and only take a half hour for lunch.  This schedule allowed Ms. Martinez to take her son to child care before work, and pick him up after school before the school's after care closed. Ms. Rosa offered similar flexibility to every employee, upon request.  Standard working hours for EMR Analysts were from 8:00 a.m. to 5:00 p.m.; however, the EMR Analyst was a salaried position.

On November 5, 2010, Ms. Martinez suffered a bilateral pulmonary embolism.  She was taken to the hospital emergency room via ambulance and was admitted to Methodist Hospital in Indianapolis, Indiana due to blood clots in her lungs.  Ms. Martinez was treated with a series of tests, a thyroid biopsy, and given blood thinning medication.  She was received inpatient treatment from a pulmonologist for five days.  After she was discharged from the hospital, Ms. Martinez was instructed to continue seeing her family physician, Dr. Denise Blad, for regular treatment and testing.  The treatments consisted of lovenox injections and warfarin tablets, both of which Ms. Martinez administered to herself.  Immediately after her hospital stay, Ms. Martinez developed a staph infection and had an adverse reaction to the antibiotic, requiring her to return to the hospital emergency room where she was re-admitted to the hospital.  During this period of hospitalization, Ms. Martinez regularly communicated about her condition to her

fellow EMR Analysts, Lauren Borgmann ("Ms. Borgmann"), Lisa Utter ("Ms. Utter") and Eric Pamperin ("Mr. Pamperin"). Ms. Martinez's doctor advised her to take additional time off after her release from the hospital. Because she only had a total of five days of paid time off, Ms. Martinez returned to work on November 11, 2010.

When Ms. Martinez returned to work, she discovered that Ms. Rosa had resigned, and Ms. Borgmann was the new EMR Analysts' supervisor. Ms. Borgmann met with Ms. Martinez on November 19, 2010, along with IU Health's chief medical officer, Dr. Donald Trainor. At the meeting, Ms. Borgmann and Dr. Trainor discussed their concerns regarding Ms. Martinez's attendance and that she had missed an EMR team meeting scheduled for 9:30 a.m. that day. Ms. Borgmann also informed Ms. Martinez that she was no longer allowed to arrive late in the morning and leave early in the afternoon as she had been doing when Ms. Rosa was her supervisor. Ms. Martinez was given two weeks to make alternative arrangements so that she could arrive at work by 8:00 a.m. and leave at 5:00 p.m. She was also reminded that she was in her initial employment period, and was instructed to provide Ms. Borgmann with daily timesheets documenting her arrival and departure times. The timesheet was not a Healthnet or IU Health form, and no other EMR Analysts were required to document their arrival and departure times. Dr. Trainor also informed Ms. Martinez that her doctor's appointments during work hours were beginning to interfere with her work.

On December 20, 2010, Ms. Borgmann held a hiring team meeting in order to review candidates to replace the EMR Analyst position that had been recently vacated when Ms. Borgmann moved into the EMR Manager position. Ms. Martinez and the two other EMR Analysts, Ms. Utter and Mr. Pamperin, attended the meeting. During the meeting, they discussed the candidacy of Denise Vititoe ("Ms. Vititoe"). Ms. Vititoe had previously worked for

3

Healthnet, and had been interviewed by Ms. Borgmann, Ms. Martinez, and Ms. Utter.  Ms. Borgmann expressed concern about Ms. Vititoe's ability to handle the position because she had three small children.  Ms. Borgmann also stated that employing Ms. Vititoe was unlikely because she also believed Ms. Vititoe had concealed her pregnancy during an interview for her prior employment with Healthnet.  Ms. Martinez expressed to Ms. Borgmann during the meeting that she believed basing a hiring decision on a candidate's motherhood or pregnancy was against the law.  Ms. Borgmann responded that pregnancy was a liability to the EMR Analysts' time frame.

On January 3, 2011, Ms. Borgmann met one-on-one with Ms. Martinez to discuss her performance.  Ms. Borgmann informed Ms. Martinez that she had received several complaints from other IU Health employees regarding Ms. Martinez's lack of professionalism and perceived trustworthiness.  Ms. Borgmann also started documenting all of her meetings with Ms. Martinez, whereas she had not done so before.  Ms. Borgmann had another documented conversation with Ms. Martinez on January 4, 2011 where Ms. Martinez expressed concerns about their meeting the day before.  Following her conversation with Ms. Borgmann, Ms. Martinez contacted Kevin Vahle ("Mr. Vahle"), an employee relations consultant for IU Health, and reported the alleged discriminatory comment made by Ms. Borgmann during the hiring meeting regarding pregnancy being a "liability" to IU Health.  She also told Mr. Vahle that she believed she was being retaliated against by Ms. Borgmann for speaking out about her comment during the hiring meeting.  Mr. Vahle told Ms. Martinez that he would look into the matter.

On January 6, 2011, Ms. Martinez met with Ms. Borgmann and Dr. Trainor where they provided feedback regarding Ms. Martinez's improved attendance and further discussed the complaints Ms. Borgmann had received regarding her performance and professionalism. Following this meeting, Ms. Martinez again contacted Mr. Vahle to follow up with him

regarding her January 4, 2011 complaint.  Mr. Vahle informed her that he had looked into the matter and there were no findings.  However, no one from IU Health or Healthnet had ever contacted Ms. Martinez regarding their investigation of the matter.  Mr. Vahle also expressed to Ms. Martinez that perhaps her position with Healthnet was not a "good fit" for her.

Ms. Borgmann and Dr. Trainor met with Ms. Martinez again on January 13, 2011 to discuss additional instances of tardiness that Ms. Martinez had accumulated since the beginning of the year; she had been late seven of the first ten days of January 2011.  Ms. Borgmann and Dr. Trainor also addressed an inaccurate starting time on Ms. Martinez's spreadsheet for January 10, 2011.  Ms. Martinez had noted a start time of 8:00 a.m., but she had actually arrived at 8:20 a.m. However, that morning she had called Ms. Borgmann to inform her that she would be late and stated the discrepancy was inadvertent.  Ms. Martinez was informed that falsification of her timesheet was grounds for termination, but she was not immediately terminated because they had just discovered the discrepancy and needed to discuss how to address the misrepresentation.

On January 20, 2011, Ms. Borgmann and Dr. Trainor met with Ms. Martinez and asked for her resignation in lieu of termination for the alleged timesheet misrepresentation and tardiness.  Ms. Borgmann offered Ms. Martinez the option of resignation with four weeks' notice so she would have time to find another job.  Dr. Trainor told Ms. Martinez that the position with Healthnet was not a "good fit" for her, and she agreed.  Ms. Martinez e-mailed Ms. Borgmann on January 21, 2011 and provided her four week notice of resignation.  Ms. Martinez filed her charge of discrimination and retaliation with the Equal Employment Opportunity Commission on January 21, 2011.

## II.   <u>LEGAL STANDARD</u>

Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Hemsworth v. Quotesmith.Com, Inc.*, 476 F.3d 487, 489–90 (7th Cir. 2007).  In ruling on a motion for summary judgment, the court reviews "the record in the light most favorable to the nonmoving party and draw[s] all reasonable inferences in that party's favor." *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009) (citation omitted).  However, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." *Hemsworth*, 476 F.3d at 490 (citation omitted). "In much the same way that a court is not required to scour the record in search of evidence to defeat the motion for summary judgment, nor is it permitted to conduct a paper trial on the merits of a claim." *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001) (citation and internal quotations omitted).  "[N]either the mere existence of some alleged factual dispute between the parties … nor the existence of some metaphysical doubt as to the material facts … is sufficient to defeat a motion for summary judgment." *Chiaramonte v. Fashion Bed Group, Inc.*, 129 F.3d 391, 395 (7th Cir. 1997) (citations and internal quotations omitted).

## III.   <u>DISCUSSION</u>

Ms. Martinez asserts that she was terminated based upon her alleged disability, pulmonary embolism, and in retaliation for opposing allegedly discriminatory hiring practices by her supervisor, Ms. Borgmann.

A.     **ADA Claim**

Ms. Martinez argues that her pulmonary embolism condition is an actual disability, or alternatively, that Healthnet regarded her as disabled, and that Healthnet terminated her based upon her disability.   The ADA prohibits employers from discriminating against disabled employees because of their disability.  42 U.S.C. § 12112(a).  In order to make out a *prima facie* case of discrimination under the ADA, a plaintiff must show: (1) that she suffers from a disability as defined in the statutes; (2) that she is qualified to perform the essential functions of the job in question, with or without reasonable accommodation; and (3) that she has suffered an adverse employment action as a result of her disability.  *Jackson v. City of Chi.*, 414 F.3d 806, 810 (7th Cir. 2005).  Ms. Martinez argues that she can establish disability discrimination under the direct method of proof.  *See Dickerson v. Bd. of Trustees of Cmty. Coll. Dist. No. 522*, 657 F.3d 595, 601 (7th Cir. 2011), reh'g denied (Oct. 18, 2011) ("Under the direct method, a plaintiff can present either direct or circumstantial evidence to meet its burden.").

The primary issue that the parties contest is whether Ms. Martinez satisfies the first prong of the *prima facie* case, which is that she suffers from a disability as defined by the statute.  In order to show that she was disabled, Ms. Martinez must show either (1) that she has a "physical or mental impairment that substantially limits [her in] one or more major life activities"; (2) that she "has a record of such an impairment"; or (3) that the employer "regarded [her] as having such an impairment."  42 U.S.C. § 12102(2)(A)-(C).  The type of "major life activities" that must be substantially limited to fall under the purview of the ADA include, but are not limited to: caring for oneself, learning, reading, concentrating, thinking, communicating, and working.  42 U.S.C. § 12102(2).  "Not every medical affliction amounts to, or gives rise to, a substantial

limitation on a major life activity." *Cassimy v. Bd. of Educ. of Rockford Pub. Sch., Dist. No. 205*, 461 F.3d 932, 936 (7th Cir. 2006).

Ms. Martinez has not presented sufficient evidence from which a reasonable jury could find that she had a disability. The evidence shows that Ms. Martinez was able to return to work without any restriction the day after she was released from the hospital, and she was able to resume her regular workload. (Martinez Decl. ¶ 9.) While she did experience some fatigue, disorientation, and difficulty with breathing, and continued to receive medical monitoring and treatment for her condition, there is no indication that she experienced any substantial limitations in her life activities. "[A] mere limitation is not enough to constitute a disability; there must be a *substantial* limitation" and "'the impairment must substantially limit employment generally.'" *Sinkler v. Midwest Property Mgmt. Ltd. P'ship*, 209 F.3d 678, 685 (7th Cir.2000) (quoting *Byrne v. Board of Educ.*, 979 F.2d 560, 565 (7th Cir.1992)). Ms. Martinez has not presented evidence that her pulmonary embolism substantially limited her employment, and the Court concludes that a reasonable jury could not find that Ms. Martinez had a disability as defined by the ADA.

Ms. Martinez has also failed to present sufficient evidence that Healthnet regarded her as having a disability. To defeat the Defendants' motion for summary judgment, Ms. Martinez must establish that there is a factual dispute about whether Healthnet regarded her impairment as being substantially limiting. *See Davidson v. Midelfort Clinic, Ltd.*, 133 F.3d 499, 510 (7th Cir. 1998). Ms. Martinez alleges that the fact she was placed on a more stringent schedule and reporting requirements than the two other EMR Analysts following her return from her hospitalization supports the inference that the schedule change was discriminatory. However, the evidence shows that the schedule change occurred following Ms. Martinez's change of supervisor from Ms. Rosa to Ms. Borgmann, who was no longer willing to accommodate Ms.

Martinez's flexible schedule that Ms. Rosa had permitted due to Ms. Martinez's child care arrangements and hour long commute.  Ms. Martinez points to evidence that Dr. Trainor stated that the frequency and scheduling of her follow-up medical appointments was beginning to interfere with her job also supports an inference that Healthnet regarded her as disabled. However, frequent medical appointments alone do not support an inference that an employer regards an employee as disabled.  *See Gorbitz v. Corvilla, Inc.*, 196 F.3d 879, 882 (7th Cir. 1999) ("Even though she had numerous medical appointments, it does not necessarily follow that [the employer] assumed she had a disability because it is well known that medical appointments, in and of themselves, do not signal the existence of a disability.").  Ms. Martinez's speculation about what Healthnet might have believed based upon the frequency of her medical appointments does not create a genuine issue of fact and is not sufficient to defeat the Defendants' summary judgment motion.  *Id.*  When an employee cannot show that her impairment rises to the level of a disability or perceived disability, the ADA "does not protect people . . . from being fired because of illness."  *Waggoner v. Olin Corp.*, 169 F.3d 481, 484 (7th Cir. 1999).  Even if Ms. Martinez's impairment fell within the definition of "disabled," the fact that Healthnet required her regular, on-time attendance does not constitute unlawful discrimination based on disability.  "An employer is generally permitted to treat regular attendance as an essential job requirement and need not accommodate erratic or unreliable attendance."  *Basden v. Prof'l Transp., Inc.*, 714 F.3d 1034, 1037 (7th Cir. 2013) (citing *EEOC v. Yellow Freight Sys., Inc.*, 253 F.3d 943, 948–49 (7th Cir. 2001)).  A plaintiff whose disability prevents her from coming to work regularly cannot perform the essential functions of her job, and thus cannot be a qualified individual for ADA purposes.  *Waggoner v. Olin Corp.,* 169 F.3d 481, 484–85 (7th Cir. 1999).

Because Ms. Martinez has failed to present a sufficient question of fact as to whether she meets the definition of "disabled" under the ADA, she has not shown that she can prove her *prima facie* case of discrimination based upon actual or perceived disability. Therefore, the Court **GRANTS** Defendants' motion for summary judgment on Ms. Martinez's ADA claim.

## B.   Retaliation Claim

Ms. Martinez next claims she was terminated in retaliation for opposing allegedly discriminatory hiring practices by Ms. Borgmann in violation of Title VII. Title VII prohibits an employer from acting in retaliation against employees who oppose any practice made unlawful under Title VII. 42 U.S.C. §2000e-3(a). Protection under the anti-retaliation provision of Title VII is not lost simply because an employee is mistaken about the merits of her complaint. *Mattson v. Caterpillar, Inc.*, 359 F.3d 885, 892 (7th Cir. 2004); *Sweeney v. West*, 149 F.3d 550, 554 (7th Cir. 1998) ("[A]n employee may complain (in good faith) without the added burden of having to be right."). To prevail, "she need only show that, when instituting her grievance, she had a 'sincere and reasonable belief' that she was opposing an unlawful practice." *Magyar v. St. Joseph Reg'l Med. Ctr.*, 544 F.3d 766, 771 (7th Cir. 2008) (quoting *Hamner v. St. Vincent Hosp. & Health Care Ctr., Inc.*, 224 F.3d 701, 706-07 (7th Cir. 2000)). A plaintiff may establish a *prima facie* case of retaliation using either the direct or indirect method. *Stone v. City of Indianapolis Pub. Util. Div.*, 281 F.3d 640, 642 (7th Cir. 2002). Under the direct method, the plaintiff must present direct evidence of (1) a statutorily protected activity; (2) an adverse action taken by the employer; and (3) a causal connection between the two. *Id.* at 644. Ms. Martinez asserts that she can establish retaliation under the direct method. The type of circumstantial evidence that a plaintiff may produce to survive summary judgment under the direct method includes: (1) suspicious timing; (2) ambiguous statements or behavior towards other employees

10

in the protected group; (3) evidence, statistical or otherwise, that similarly situated employees outside of the protected group systematically receive better treatment; and (4) evidence that the employer offered a pretextual reason for an adverse employment action. *Dickerson*, 657 F.3d at 601.

Ms. Martinez has shown that she satisfies the first and second prong of her *prima facie* retaliation claim.  Ms. Martinez engaged in statutorily protected conduct when she expressed her objection directly to Ms. Borgmann regarding Ms. Borgmann's comments about not wanting to hire Ms. Vititoe because she was a woman with three young children and because Ms. Borgmann believed Ms. Vititoe had concealed her pregnancy when she previously interviewed and was hired for a position at Healthnet.  She also engaged in statutorily protected activity when she reported Ms. Borgmann's comments to Mr. Vahle in Healthnet's human resources department. Although Ms. Martinez chose to resign when faced with the choice of termination or resignation, the parties do not dispute that she was subject to an adverse employment action, so the Court will treat Healthnet's request for Ms. Martinez's resignation as a termination.

However, the parties dispute whether she can satisfy the third prong by showing a causal connection between her statutorily protected activity and her termination.  "A causal link between the protected expression and an adverse employment action may be established by showing that the protected conduct was a substantial or motivating factor in the employer's decision." *Culver v. Gorman & Co.*, 416 F.3d 540, 545 (7th Cir. 2005).  "A motivating factor does not amount to a but-for factor or to the only factor, but is rather a factor that motivated the defendant's actions." *Spiegla v. Hull,* 371 F.3d 928, 942 (7th Cir. 2004).

Viewing the evidence in light most favorable to Ms. Martinez as the non-moving party, Ms. Martinez has presented sufficient circumstantial evidence from which a reasonable jury

could infer that her termination was motivated by unlawful retaliation. First, Ms. Martinez argues that she was terminated shortly after reporting Ms. Borgmann's alleged discriminatory comments about the female job candidate to Mr. Vahle on or around January 4 and January 6, 2011, and that this suspicious timing is evidence of retaliation. While suspicious timing alone is insufficient to establish a genuine issue of material fact to support a retaliation claim, *Wyninger v. New Venture Gear, Inc.*, 361 F.3d 965, 981 (7th Cir. 2004), "suspicious timing may permit a plaintiff to survive summary judgment if there is other evidence that supports the inference of a causal link." *Culver v. Gorman & Co.*, 416 F.3d 540, 546 (7th Cir. 2005). Defendants argue that the evidence shows that Ms. Borgmann and Dr. Trainor did not know that Ms. Martinez reported Ms. Borgmann's comments to Mr. Vahle prior to her termination. However, Ms. Martinez made her initial complaint directly to Ms. Borgmann, so her supervisor was already aware of her complaint. In addition, Mr. Vahle informed Ms. Martinez that he had "looked into the matter" which may imply that Ms. Borgmann had been informed at some point that Ms. Martinez made a complaint to Healthnet's human resources department. Dkt. 43-13 at 6, Vale Dep. 21:10-21:14. "When an adverse employment action follows on the close heels of protected expression and the plaintiff can show the person who decided to impose the adverse action knew of the protected conduct, the causation element of the *prima facie* case is typically satisfied." *Culver*, 416 F.3d at 546 (quoting *Lalvani v. Cook Cnty., Ill.*, 269 F.3d 785, 790 (7th Cir. 2001)).

Defendants assert that Ms. Martinez was terminated for being tardy multiple times, falsifying her timesheet, and lack of professionalism. The evidence shows that Ms. Borgmann scrutinized and became more critical of Ms. Martinez following her complaint in the hiring meeting. While it is true that Ms. Martinez previously had problems with tardiness following the change in her work schedule, at the January 6, 2011 meeting between Ms. Martinez, Ms.

Borgmann and Dr. Trainor, Ms. Borgmann noted in her meeting notes that Ms. Martinez had improved her attendance and tardiness.   Dkt. 43-7 at 1-3.   The evidence also indicates that, following her complaint about Ms. Borgmann's alleged discriminatory comment, Ms. Borgmann began documenting every conversation with Ms. Martinez, requested weekly meetings, and began to have complaints about Ms. Martinez's professionalism, including focusing on things such as the volume of Ms. Martinez's voice and laugh.   Dkt. 43-5 at 1.   "[A]n employer's sudden dissatisfaction with an employee's performance after that employee engaged in a protected activity may constitute circumstantial evidence of causation."   *Culver*, 416 F.3d at 546.

Ms. Martinez has also presented evidence that may suggest Healthnet's reason for terminating her was pretext for retaliation.   There was a statement made by both Dr. Trainor and Mr. Vahle shortly following Ms. Martinez's complaint that she may not be a "good fit" for her position at Healthnet.   Dkt. 43-13 at 7-8, Vale Dep. 25:12-26:2; Dkt. 43-2 at 20, Martinez Dep. 181:24-182:16.   However, Ms. Martinez was ultimately terminated for incorrectly stating her arrival time on her timesheet for January 10, 2011, despite having informed Ms. Borgmann of her correct arrival time that day and despite the fact that salaried Healthnet employees were not required to maintain time sheets.   Viewing all of this evidence in a light most favorable to Ms. Martinez, a reasonable fact finder could conclude that Healthnet's reasons for her termination were pretext for retaliation.   Therefore, the Court **DENIES** the Defendants' motion for summary judgment on Ms. Martinez's retaliation claim.

## IV.   CONCLUSION

For the reasons set forth above, the Defendants' Motion for Summary Judgment (Dkt. 36) is **GRANTED in part** and **DENIED in part**. The Motion is **GRANTED** as to Ms. Martinez's ADA claim, and **DENIED** as to Ms. Martinez's Title VII retaliation claim.

**SO ORDERED.**

Date: 10/25/2013
_____


Hon. Tanya Walton Pratt, Judge
United States District Court
Southern District of Indiana

DISTRIBUTION:

Stephanie Lynn Cassman
LEWIS WAGNER LLP
scassman@lewiswagner.com

Theresa Renee Parish
LEWIS WAGNER LLP
tparish@lewiswagner.com

Jeffrey A. Macey
MACEY SWANSON & ALLMAN
jmacey@maceylaw.com

Barry A. Macey
MACEY SWANSON AND ALLMAN
bmacey@maceylaw.com